**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| **MARY L. WHEATLEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 1:04 CV 79 RWS (LMB)** |
| | ) | |
| **JO ANNE B. BARNHART,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision

denying Mary Wheatley's applications for a Period of Disability and Disability Insurance Benefits

under Title II of the Social Security Act. The cause was referred to the undersigned United

States Magistrate Judge for a Report and Recommendation pursuant to

28 U.S.C. § 636 (b). Plaintiff has filed a Brief in Support of Complaint (Document Number 14).

Defendant has filed a Brief in Support of the Answer. (Doc. No. 15).

**Procedural History**

On March 19, 2002, plaintiff filed her application for a Period of Disability and Disability

Insurance Benefits, claiming that she became unable to work due to her disabling condition on

June 30, 2001. (Tr. 47-49). This claim was denied initially, and following an administrative

hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ),

dated March 22, 2004. (Tr. 35-38, 14-21). Plaintiff then filed a request for review of the ALJ's

decision with the Appeals Council of the Social Security Administration (SSA), which was denied on May 28, 2004. (Tr. 9, 6-8). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481 (2003).

## Evidence Before the ALJ

### A. ALJ Hearing

Plaintiff's administrative hearing was held on August 21, 2003. (Tr. 191). Plaintiff was present and was represented by counsel. (Id.). The ALJ stated that the state agency considered plaintiff's complaints of pain in the hips and knees, anxiety attacks, arthritis,[1] fibromyalgia,[2] osteoarthritis,[3] and loss of strength in the hands from carpal tunnel syndrome,[4] and concluded that plaintiff was able to return to her past work as a counselor. (Tr. 192). Plaintiff agreed with the ALJ's statement of the procedural history of her case. (Id.). The ALJ then admitted a number of exhibits into evidence. (Id.). Plaintiff's attorney indicated that he was waiting for a Medical Source Statement from Dr. Tammy Albrecht, a general practitioner. (Id.). The ALJ explained the hearing procedure to plaintiff. (Tr. 193-94).

The ALJ then examined plaintiff, who testified that she lived in Wardell, Missouri. (Tr.

---

[1]Inflammation of a joint. Stedman's Medical Dictionary, 149 (27th Ed. 2000).

[2]A syndrome of chronic pain of musculoskeletal origin but uncertain cause. The American College of Rheumatology has established diagnostic criteria that include pain on both sides of the body both above and below the waist, as well as in an axial distribution; additionally there must be point tenderness in at least 11 of 18 specified sites. Stedman's at 671.

[3]Arthritis characterized by erosion of articular cartilage, which affects weight-bearing joints. Stedman's at 1282.

[4]Nerve entrapment characterized by nocturnal hand paresthesia and pain, and sometimes sensory loss in the medial hand distribution. Stedman's at 1749.

194).  Plaintiff explained that she and her husband moved from Washburn to her mother's home in

Wardell when her husband lost his job as a high school principal.  (Tr. 195).  Plaintiff stated that

she was born on July 31, 1955, she is just under six feet tall, and she weighs 220 pounds.  (Id.).

Plaintiff testified that her weight has fluctuated between 220 to 240 since the alleged onset of her

disability on June 30, 2001.  (Id.).  Plaintiff stated that she has been trying to lose weight.  (Id.).

Plaintiff testified that she has a driver's license but she does not drive in "crowded traffic."  (Tr.

195-96).  Plaintiff stated that she only drives in the country for 15 to 30 minutes because she

cannot sit for longer periods of time.  (Tr. 196).  Plaintiff testified that she completed the eleventh

grade in public schools and completed the twelfth grade through a correspondence course.  (Id.).

Plaintiff stated that she can read and write and that she can add and subtract.  (Id.).  Plaintiff

testified that this was her first application for benefits and that she has not received workers'

compensation or unemployment since June 30, 2001.  (Id.).

   Plaintiff testified that she is not seeing a mental health professional for her alleged anxiety

attacks.  (Tr. 196-97).  Plaintiff stated that she is taking Wellbutrin,[5] which Dr. Albrecht

prescribed for her.  (Tr. 197).  Plaintiff explained that she experiences anxiety attacks when she is

in highly stressful situations.  (Id.).  Plaintiff testified that Dr. Valerie Smith first diagnosed her

with fibromyalgia, and referred her to a rheumatologist.  (Id.).  Plaintiff stated that her doctors

---

[5]Wellbutrin is an antidepressant indicated for the treatment of depression.  See Physician's
Desk Reference (PDR), 1655-56 (59th Ed. 2005).

have tried several medications to treat her fibromyalgia, including Celebrex[6] and Vioxx,[7] but these medications irritate her stomach. (Id.). Plaintiff explained that the only medication she currently takes is Amitriptyline,[8] which helps her sleep at night. (Id.).

Plaintiff testified that she saw Dr. Anne Winkler on one occasion, in May or June of 2003. (Tr. 197-98). The ALJ stated that Dr. Winkler completed a Medical Source Statement, indicating that plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk for six hours in an eight-hour workday, and sit six hours in an eight-hour workday. (Tr. 198). Dr. Winkler also found that plaintiff had no push-pull limitations, could frequently balance and occasionally climb, kneel, crawl, and stoop. (Id.). Dr. Winkler further found that plaintiff had some environmental limitations relating to temperature extremes, humidity and wetness, and unprotected heights. (Id.). The ALJ asked plaintiff to review Dr. Winkler's statement and to indicate whether the statement accurately described her condition. (Id.). Plaintiff responded that she cannot lift 20 pounds, she can only walk 10 to 15 minutes, and she can only sit for 15 to 20 minutes at a time before experiencing discomfort. (Tr. 199). Plaintiff also indicated that she experiences difficulty kneeling. (Id.).

Plaintiff testified that she has been experiencing migraine headaches about once a week for three to four years. (Id.). Plaintiff stated that she takes over-the-counter medications, including

---

[6]Celebrex is indicated for the relief of the signs and symptoms of osteoarthritis and for the management of acute pain. PDR at 3097.

[7]Vioxx is indicated for the relief of the signs and symptoms of osteoarthritis and for the management of acute pain. PDR at 2174.

[8]Amitriptyline is an antidepressant indicated for the relief of depression. See PDR at 2213.

Excedrin Migraine, and lies down in a dark room when she experiences migraine headaches. (Tr. 200). Plaintiff explained that she told Dr. Albrecht about the migraines and Dr. Albrecht advised her to try over-the-counter medications. (Id.).

Plaintiff testified that she also has carpel tunnel syndrome. (Id.). Plaintiff stated that she had surgery on the right hand, but she did not want to have surgery on the left hand because she found that surgery did not help. (Id.). Plaintiff testified that she has difficulty lifting objects and writing due to the carpel tunnel syndrome. (Id.). Plaintiff explained that she can only write for 5 to 10 minutes before experiencing pain that extends to her elbow. (Id.).

Plaintiff testified that she experiences problems with her hips and knees. (Tr. 200-201). Plaintiff explained that she cannot bend or stoop without receiving assistance getting up. (Tr. 201). Plaintiff stated that she constantly experiences pain in her hips that is either due to the arthritis or the fibromyalgia. (Id.). Plaintiff testified that Dr. Albrecht diagnosed the knee pain as osteoarthritis. (Id.). Plaintiff stated that she underwent x-rays and an MRI.[9] (Id.). Plaintiff testified that the MRI revealed no abnormalities. (Tr. 201-02).

Plaintiff testified that Dr. Winkler advised her to keep taking the Amitriptyline and to lose weight by increasing her exercise. (Tr. 202). Plaintiff stated that she has arthritic problems in her hands, knees, hips, back, and toes. (Id.). Plaintiff testified that Dr. Albrecht prescribed Wellbutrin. (Id.). Plaintiff stated that she experiences depression. (Tr. 203). When asked about the side effects of her medications, plaintiff stated that the Amitriptyline causes her mouth to be dry in the morning. (Tr. 203). Plaintiff testified that she saw Dr. Albrecht regularly until Dr. Yvonne Agius took over her practice, at which time she began seeing Dr. Agius. (Id.). Plaintiff

---

[9]Magnetic Resonance Imaging. Stedman's at1135.

stated that the last doctor she saw was Dr. Winkler. (Id.).

Plaintiff testified that she has not worked or performed any volunteer work since her alleged disability onset date of June 30, 2001. (Tr. 204). Plaintiff stated that she chose the onset date June 30, 2001 because she finished the school year as a counselor's aide for Hayti School District and she could no longer perform her job duties. (Id.). Plaintiff testified that her last job was created by her employer so that she could continue working. (Id.). Plaintiff stated that she answered the phone, took messages, filed, and occasionally typed letters. (Id.). Plaintiff indicated that her position was secretarial, except that she could not do extensive typing due to her carpel tunnel syndrome. (Tr. 205). Plaintiff testified that while she worked as a counselor's aide she also drove a school bus. (Id.).

Plaintiff testified that she performed custodial work for Excelsior Springs Public Schools in 1988. (Id.). Plaintiff stated that she cleaned rooms, swept, emptied trash, mopped, dusted, and waxed floors. (Tr. 205-06). Plaintiff testified that the heaviest object she lifted at this job weighed 30 to 40 pounds. (Tr. 205). Plaintiff stated that she worked for Drury Inns, Inc. as a maid in 1989. (Tr. 206). Plaintiff explained that she cleaned guest rooms and the heaviest object she lifted was a vacuum cleaner. (Id.). Plaintiff testified that she worked for the Special School District of Pemiscot County in 1989 and 1990, where she performed custodial work. (Id.). Plaintiff stated that she cleaned, mopped, and waxed, and that the heaviest object she lifted weighed 30 to 40 pounds. (Tr. 206-07). Plaintiff testified that she worked for North Pemiscot School District after that, where she also performed custodial work. (Tr. 207). Plaintiff explained that she unloaded grocery trucks at this job and lifted up to 75 pounds. (Id.).

Plaintiff testified that she performed a few different jobs at the Hayti School District.

(Id.).  Plaintiff stated that she began as a custodian and that her husband, who also worked there, helped her with the necessary heavy lifting.  (Id.).  Plaintiff testified that she was offered the counselor's aide position when she informed her employer that she could no longer perform the custodial work.  (Id.).  Plaintiff indicated that the heaviest object she lifted as a counselor's aide weighed five pounds or less.  (Id.).  Plaintiff stated that she generally typed about two letters per week.  (Tr. 208).  Plaintiff testified that she also assisted her boss with completing school records, dealing with students, setting up college visits, and dealing with armed service recruiters.  (Id.).

Plaintiff's attorney then examined plaintiff, who testified that the Amitriptyline produced a "hangover effect."  (Id.).  Plaintiff explained that for the first hour or two after she wakes up in the morning she feels disoriented.  (Id.).  Plaintiff stated that she also takes Wellbutrin and Neurontin[10] for her hip and knee problems.  (Tr. 209).  Plaintiff testified that she takes Detrol[11] for bladder control problems caused by a hysterectomy.  (Id.).  Plaintiff stated that the fibromyalgia began after she fell at work in 1995.  (Id.).

Plaintiff then described her typical day.  She testified that she wakes up between 9:30 and 10:30 in the morning and tries to do chores such as washing dishes, sweeping the floor, and laundry.  (Tr. 210).  Plaintiff stated that she usually lies down for an hour or two in between chores due to pain.  (Id.).  Plaintiff explained that on a daily basis she typically only washes the dishes and either washes a load of laundry or sweeps the floors.  (Id.).  Plaintiff stated that when she washes the dishes she has to shift her weight due to the pain in her hips and knees.  (Id.).

---

[10]Neurontin is indicated for the management of postherpetic neuralgia in adults.  PDR at 2590.

[11]Detrol is indicated for the treatment of overactive bladder with symptoms of urge urinary incontinence, urgency, and frequency.  PDR at 2721.

Plaintiff testified that she frequently must lie down for a few minutes after washing the dishes. (Tr. 211). Plaintiff stated that she no longer works outside. (Id.).

The ALJ then examined plaintiff, who testified that she saw Dr. Wolf on one occasion. (Id.). Plaintiff testified that Dr. Wolf recommended water therapy exercises but her insurance did not cover it and she could not afford it. (Id.). Plaintiff stated that Dr. Wolf also recommended increased exercise and that she bought a treadmill. (Tr. 211-12). Plaintiff testified that she can only use the treadmill for five minutes before experiencing "excruciating pain." (Tr. 212). Plaintiff stated that she and her husband walk outside for 10 to 15 minutes, stopping frequently. (Id.). Plaintiff testified that she goes out to eat or to a movie occasionally and that she goes to church once or twice every three months. (Id.). Plaintiff stated that she can perform some household chores but she has to stop and rest afterward. (Id.). Plaintiff testified that when she has an anxiety attack she gets nervous and hot and she has difficulty breathing. (Id.). Plaintiff explained that she experienced anxiety attacks for the last few years that she was working and that when this occurred she would go outside to obtain relief. (Tr. 213).

Plaintiff's attorney then examined plaintiff's husband, Charles Wheatley, who described plaintiff's impairments. (Tr. 214-16). Mr. Wheatley testified that plaintiff cannot perform household chores such as sweeping and mopping. (Tr. 214). He stated that plaintiff also has difficulty performing small tasks such as lifting a gallon of tea or lifting a skillet. (Id.). Mr. Wheatley testified that plaintiff frequently spends the day lying down with a heating pad to alleviate her pain. (Id.). Mr. Wheatley stated that plaintiff has difficulty sleeping due to the pain. (Id.). Mr. Wheatley further testified that plaintiff experiences depression and anxiety. (Tr. 215). He explained that plaintiff frequently experiences difficulty breathing. (Id.). Mr. Wheatley

testified that plaintiff used to enjoy doing yard work but she can no longer do this. (Id.). Mr Wheatley stated that he performed about half of the work for plaintiff when she worked as a custodian. (Tr. 216). He testified that plaintiff is very limited in the amount of weight she can lift. (Id.).

The ALJ then examined Mr. Wheatley, who testified that plaintiff left her counselor's aide job at Hayti because Mr. Wheatley left his job there and moved to Washburn. (Id.). He explained that plaintiff decided to quit her job because they did not want to live apart. (Id.). Mr. Wheatley testified that plaintiff was reaching her physical limits when she stopped working at Hayti. (Tr. 217). He stated that plaintiff was physically exhausted when she got home from work everyday. (Id.). The ALJ then asked Mr. Wheatley to examine Dr. Winkler's Medical Source Statement, and to indicate whether the statement was accurate. (Tr. 217-18). Mr. Wheatley responded that Dr. Winkler has not observed plaintiff on a day-to-day basis as he has and that Dr. Winkler has not witnessed her pain. (Tr. 218). Mr. Wheatley testified that plaintiff is not able to sleep through the night. (Tr. 219). He stated that plaintiff typically does not fall asleep until early morning and only sleeps four to five hours. (Tr. 219-20).

Plaintiff's attorney then indicated to the ALJ that he intended to obtain a Medical Source Statement from Dr. Albrecht. (Tr. 220). Plaintiff stated that she last saw Dr. Albrecht in January or February of 2003. (Id.). Plaintiff's attorney testified that he did not request a Medical Source Statement from Dr. Wolf . (Id.). The ALJ stated that he would allow plaintiff 21 days to obtain the Medical Source Statements. (Tr. 221).

The ALJ then examined the vocational expert, Dr. Cathy Hodgson. (Tr. 222). Dr. Hodgson testified that plaintiff's work as a school custodian was semi-skilled and performed

at the medium level. (Tr. 223). Dr. Hodgson stated that plaintiff's job at North Pemiscot County, where she unloaded trucks, was considered heavy. (Id.). Dr. Hodgson testified that plaintiff's work as a motel maid was unskilled and light. (Id.). Dr. Hodgson stated that plaintiff's work as a counselor's aide was really that of a receptionist, and was semi-skilled and sedentary. (Tr. 224). Finally, Dr. Hodgson testified that plaintiff's work as a school bus driver was semi-skilled and medium. (Id.).

The ALJ formulated two hypotheticals for Dr. Hodgson. (Id.). First, the ALJ asked Dr. Hodgson whether an individual who could lift 20 pounds occasionally; lift 10 pounds frequently; stand or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; frequently balance; occasionally climb, kneel, crouch, crawl and stoop; is limited as to temperature extremes, humidity and wetness; and is limited as to hazards could perform any of plaintiff's past work. (Id.). Dr. Hodgson responded that work would be available for such an individual. (Tr. 225). Specifically, she stated that such an individual could still work as a receptionist. (Id.). Dr. Hodgson testified that such an individual could also perform a wide range of sedentary, unskilled work such as "table worker" and "order cook, food and beverage." (Id.). The ALJ then asked Dr. Hodgson whether an individual with the following limitations could perform plaintiff's past work: capable of sedentary work; continuous standing, walking, and sitting limited to 15 minutes; and two hours of rest required in a nine-hour work period. (Tr. 225-26). Dr. Hodgson responded that such an individual could not perform any of plaintiff's past work. (Tr. 226). Dr. Hodgson stated that there is no other work that such an individual could perform. (Id.).

Plaintiff's attorney then examined Dr. Hodgson, who testified that the position

"order cook, food and beverage" is a counter clerk's position.  (Id.).  Dr. Hodgson stated that

such an individual works in a climate-controlled area inside a building, although they are in close

proximity to cooks.  (Tr. 227).  Dr. Hodgson testified that a "table worker" is a production

worker who assembles objects.  (Id.).  When asked whether an individual with carpel tunnel

syndrome could perform the position of table worker or receptionist Dr. Hodgson responded that

it would depend on the extent of the restriction, although it could play a major role in the

individual's ability to perform these jobs.  (Id.).  Dr. Hodgson testified that an individual who can

only sit for 15 to 20 minutes and must lie down during the workday could not work at all.

(Tr. 228).

The ALJ commented that he hoped plaintiff's attorney could obtain additional medical

evidence, which would determine whether he needed to further develop the record.  (Id.).  The

ALJ then concluded the hearing and stated that he would leave the record open.  (Tr. 229).


B.    **Relevant Medical Records**

The record reveals that plaintiff was treated at the Portageville Primary Care Center from

March 1996 through July 2000.  (Tr. 141-165).  During this period, plaintiff often complained of

headaches, and pain in her right elbow, hips, and knees.  (See id.).  Plaintiff also complained of

anxiety on occasion.  (See id.).  Plaintiff was diagnosed with osteoarthritis of the right elbow

(Tr. 147), right carpal tunnel syndrome (Tr. 148), and fibromyalgia (Tr. 141).

Plaintiff presented to Tammy Albrecht, M.D. at Roaring River Family Medicine on March

19, 2002, complaining of bilateral hip and knee pain.  (Tr. 117).  Dr. Albrecht's assessment was

osteoarthritis, obesity, and fibromyalgia.  (Id.).  Dr. Albrecht gave plaintiff samples of Vioxx and

recommended that she start a weight loss program consisting of Weight Watchers and water aerobics. (Id.). Plaintiff underwent x-rays of her hips and knees on March 19, 2002 and on March 29, 2002, which revealed modest arthritic changes but no acute abnormalities. (Tr. 118-19). The radiologist's impression was "normal." (Tr. 118). Dr. Albrecht saw plaintiff again on April 11, 2002, at which time plaintiff reported no relief from the Vioxx. (Tr. 116). Dr. Albrecht's assessment was "osteoarthritis, bilateral hips and knees." (Id.). Dr. Albrecht referred plaintiff to Marian Wolf, M.D., for orthopedic evaluation and prescribed Darvocet[12] for pain. (Id.).

Plaintiff was seen by Dr. Wolf, an orthopedic specialist, on April 23, 2002, at which time she complained of pain in her hips and knees. (Tr. 121). Upon examination, Dr. Wolf found no fluid in plaintiff's knees and found her range of motion to be normal. (Id.). Dr. Wolf also found plaintiff's hips to be within normal limits. (Id.). Dr. Wolf's assessment was "early osteoarthritis of the knees and low back." (Id.). Dr. Wolf stated that plaintiff "probably has a combination of osteoarthritis as well as fibromyalgia." (Id.). Dr. Wolf gave plaintiff a prescription for Feldene[13] for her knees and started her on water therapy exercises. (Id.).

Lester Bland, Psy.D, a State agency non-examining psychological consultant, completed a Psychiatric Review Technique on May 7, 2002. (Tr. 122-36). Dr. Bland found that plaintiff's alleged mental impairments were non-severe. (Tr. 134). Ms. Wheatley reported no functional limitations due to depression. (Id.). Dr. Bland's notes reflect that the doctor called Ms. Wheatley

---

[12]Darvocet is indicated for the relief of mild to moderate pain. PDR at 402.

[13]Feldene is a non-steroidal anti-inflammatory drug indicated for the relief of signs and symptoms of osteoarthritis. See PDR at 1766.

"to further clear up her reported anxiety attacks and per phone conversation on 04/22/02 claimant reports she has not had any anxiety attacks since stopping work on 06/30/01. Claimant reports she has not sought treatment for anxiety attacks because she has not had any since that time." (Id.).

Plaintiff saw Dr. Albrecht again on October 31, 2002. (Tr. 178). Dr. Albrecht stated that plaintiff was "trying to get disability" and that the "disability people want her to be seen by a rheumatologist." (Id.). She noted that plaintiff reported experiencing a lot of pain, yet she had not followed through with any physical therapy due to "multiple family situations going on right now." (Id.). Dr. Albrecht found that plaintiff was in no acute distress and was alert and cooperative. (Id.). Dr. Albrecht's assessment was fibromyalgia. (Id.). She referred plaintiff to a rheumatoligist "for further disability and work-up." (Id.).

Anne E. Winkler, M.D., a rheumatology specialist, examined plaintiff on April 25, 2003. (Tr. 185-86). Plaintiff complained of chronic pain and lack of sleep. (Tr. 185). Plaintiff stated that she stopped taking her Amitriptyline at night regularly a year-and-a-half prior to her visit. (Id.). Plaintiff also reported that she ingests multiple caffeinated beverages daily, does not drink much water, and does not follow any type of diet, although she walks on the treadmill for 5-10 minutes two to three times a week. (Id.). Upon examination, Dr. Winkler found some tenderness in plaintiff's hands, wrists, and ankles. (Id.). She also found positive tender points in multiple areas. (Id.). Dr. Winkler scheduled more tests and advised plaintiff to eliminate caffeine from her diet, increase her consumption of water, stretch regularly, and take her Amitriptyline on a regular basis. (Id.).

Plaintiff underwent total body imaging on May 1, 2003, which revealed degenerative

changes in the spine; arthritis of the shoulders; arthritic changes in the knees, hips, and feet; and osteoarthritic changes at the bases of both thumbs. (Tr. 184). Plaintiff underwent an MRI of the lumbar[14] spine on May 20, 2003, which revealed very mild disc bulges at L1-2,[15] L2-3, L4-5, and L5-S1. (Tr. 181). The impression of the doctor interpreting the MRI was "mild multilevel lumbar degenerative disc disease[16] and facet[17] degenerative changes." (Id.).

Dr. Winkler completed a Medical Source Statement on August 4, 2003. (Tr. 137-140). Dr. Winkler found that plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, and push or pull an unlimited amount of time. (Tr. 137-38). Dr. Winkler further found that plaintiff could balance frequently and could occasionally climb, kneel, crouch, crawl, and stoop. (Tr. 138). Dr. Winkler stated that plaintiff's manipulative functions and visual/communicative functions were unaffected by her impairments. (Tr. 139). Finally, Dr. Winkler found that plaintiff should limit exposure to temperature extremes, humidity/wetness, and unprotected heights. (Tr. 140).

---

[14]The back is comprised of the cervical, thoracic and lumbar regions. In common terms, the cervical region of the spinal column is the neck; the thoracic region is the main part of the back; and the lumbar region is the lower back. There are seven cervical vertebrae, twelve thoracic vertebrae, and five lumbar vertebrae. The sacrum lies directly below the fifth lumbar vertebra. The coccyx, or tail bone, lies below the sacrum. See J. Stanley McQuade, Medical Information Systems for Lawyers, § 6:27 (1993).

[15]Abbreviation for lumbar vertebrae (L1-L5). Stedman's at 956. Lumbar Vertebrae are defined as "the vertebrae, usually five in number, located in the lumbar region of the back." Id. at 1957.

[16]Disease characterized by deterioration of the lumbar vertebrae. See Stedman's at 467.

[17]A small smooth area on a bone or other firm structure. Stedman's at 638.

# The ALJ's Determination

The ALJ made the following findings:

1. The claimant met the insured status requirements of the Social Security Act on June 30, 2001, the date she states she became unable to work, and continues to meet them through the date of this decision.

2. The claimant has not engaged in substantial gainful activity during the period under adjudication.

3. The medical evidence establishes that the claimant has the following severe impairments: Fibromyalgia and arthritis. However, the evidence does not establish medical findings that meet or equal in severity the clinical criteria of an impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1.

4. The claimant's subjective complaints and other allegations are not fully credible, for the reasons set forth in the body of this decision.

5. The claimant has the following residual functional capacity. She is able to lift and carry ten pounds frequently and twenty pounds occasionally. She is able to stand/walk, with normal breaks, approximately six hours of an eight-hour work day. She is able to sit, with normal breaks, approximately six hours of an eight-hour work day. She is able to perform pushing and pulling, including the operation of hand and foot controls, without limitation. She is able to perform occasional climbing, kneeling, crouching, crawling and stooping and is able to perform frequent balancing. Her ability to perform work involving exposure to extremes of temperature, humidity/wetness or hazards such as unprotected heights or dangerous moving machinery is limited. She has no manipulative, visual or communicative limitations.

6. The claimant's past relevant work was as a school custodian, a motel maid, a school counselor's aide and a school bus driver. The first job is semi-skilled work that is generally performed in the national economy at the medium exertional level (but was performed by the claimant at the heavy exertional level), the second job is unskilled light work, the third job is semi-skilled sedentary work and the last job is semi-skilled medium work.

7. Based on the testimony of the impartial vocational expert, the claimant's past relevant work as a counselor's aide as she performed it, did not require the performance of work-related activities precluded by her functional limitations. The claimant is thus able to perform her past relevant work as a counselor's aide as she performed it.

8.      In the alternative, the claimant is able to perform the following unskilled sedentary jobs, both of which exist in significant numbers in the regional and national economy: Production table worker and food and beverage order clerk.

9.      The claimant has not been under a disability as defined by the Social Security Act at any time through the date of this decision.

(Tr. 20-21).

The ALJ's final decision reads as follows:

It is the decision of the Administrative Law Judge, based on the application filed March 25, 2002, that the claimant is not entitled to a period of disability or to disability insurance benefits under sections 216(I) and 223, respectively, of the Social Security Act.

(Tr. 21).

## Discussion

### A.    Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it. See Mapes v. Chater, 82 F.3d 259, 262 (8th Cir. 1996). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998). It is not the court's task "to review the evidence and make an independent decision." See Mapes, 82 F.3d at 262. If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld. See id. The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision. See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)(citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)). "[T]he court must also take into

consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry."  Id.

## B.    The Determination of Disability

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful employment."  If the claimant is, disability benefits must be denied.
See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.
 See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity" determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.  See id.  If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if s/he is not able to perform any other work.  See id.  Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

### C.    Plaintiff's Claim on Appeal

In her single claim on appeal, plaintiff argues that the ALJ erroneously found plaintiff's subjective complaints of pain not credible.  Specifically, plaintiff claims that the ALJ failed to give

proper weight to plaintiff's testimony in determining plaintiff's residual functional capacity. Respondent argues that the ALJ properly applied Polaski to determine that plaintiff's allegations of disabling pain were not credible.

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski, 739 F.2d at 1322 (quoting settlement agreement between Department of Justice and class action plaintiffs who alleged that the Secretary of Health and Human Services unlawfully required objective medical evidence to fully corroborate subjective complaints). Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the Polaski factors." Kelley, 133 F.3d at 588. Polaski requires the consideration of: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions. Polaski, 739 F.2d at 1322.

Under Polaski, an ALJ must also consider a claimant's prior work record, observations by third parties and treating and examining doctors, and the claimant's appearance and demeanor at the hearing. 739 F.2d at 1322. In evaluating the evidence of nonexertional impairments, the ALJ is not free to ignore the testimony of the claimant "even if it is uncorroborated by objective medical evidence." Basinger v. Heckler, 725 F.2d 1166, 1169 (8th Cir. 1984). The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record

as a whole.  See Clark v. Chater, 75 F.3d 414, 417 (8th Cir. 1996).

The court finds that the ALJ's credibility determination regarding plaintiff's subjective complaints of pain and limitations is supported by substantial evidence in the record as a whole. "[T]he question is not whether [plaintiff] suffers any pain; it is whether [plaintiff] is fully credible when she claims that [the pain] hurts so much that it prevents her from engaging in her prior work."  Benksin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987).  Thus, the relevant inquiry is whether or not plaintiff's complaints of pain to a degree of severity to prevent her from working are credible.

In his opinion, the ALJ specifically cited the relevant Polaski factors. (Tr. 15).  The ALJ then made the following findings:

> The undersigned has evaluated the allegations of the claimant and her witness, including the claimant's subjective complaints, in accordance with S.S.R. 96-7p, 20 C.F.R. § 404.1529 and Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984).  These allegations are found to be not fully credible.  In completing a questionnaire required by the Social Security Administration as part of the application for benefits (Exhibit 4E), the claimant stated that she was generally able to clean her residence and that she was able to do laundry, do some yard work, prepare three meals a day for herself and her husband, go shopping with her husband, spend time reading, occasionally make flower arrangements and wreaths, watch television, listen to the radio, sometimes attend functions with her husband at his place of employment, visit her daughters (who live thirty-five miles away) twice a month and visit her mother (who lives three hundred miles away) "periodically." These statements, together with her hearing testimony, show that she engages in a fairly normal range of daily activities and are inconsistent with her allegation of disability.

(Tr. 18).

The ALJ properly pointed out Polaski factors and other inconsistencies in the record as a whole that detract from plaintiff's complaints of disabling pain.  The ALJ first provided a very detailed summary of the medical evidence.  The ALJ stated that Dr. Albrecht, plaintiff's treating physician, noted that plaintiff had not followed through with recommended physical therapy

despite reporting significant pain. The failure to follow a recommended course of treatment weighs against a claimant's credibility. See Gowell v. Apfel, 242 F.3d 793, 797 (8th Cir. 2001).

The ALJ noted that none of plaintiff's treating physicians found functional limitations consistent with disability. (Tr. 18). Dr. Winkler, plaintiff's treating rheumatologist, found that plaintiff was capable of performing light work. (Id.). The presence or absence of functional limitations is an appropriate Polaski factor, and "[t]he lack of physical restrictions militates against a finding of total disability." Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir. 1999)(citing Smith v. Shalala, 987 F.2d 1371, 1374 (8th Cir. 1993)). The ALJ also pointed out that, although plaintiff claims that she is disabled in part due to her anxiety attacks, she has not sought psychiatric treatment. (Id.). This is an appropriate consideration, because the fact that a plaintiff fails to seek medical treatment disfavors a finding of disability. See Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997).

The ALJ next discussed plaintiff's earning record. He stated that plaintiff had a "solid earnings history for a number of years" before the date on which she allegedly became unable to work. The ALJ properly acknowledged that plaintiff's work history demonstrates "a motivation to engage in productive activity." (Id.). Although not controlling on the issue of plaintiff's complaints of disabling pain, a claimant's work history is a proper factor in assessing credibility. See Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996).

The ALJ finally considered plaintiff's testimony concerning her daily activities. The ALJ recounted plaintiff's testimony that she is unable to perform lifting, she is able to walk and sit for only 10 to 15 minutes at a time, she requires assistance getting up if she kneels, and she must lie down for one to two hours during the day. The ALJ stated that plaintiff testified that she washes

dishes, sweeps, does laundry, occasionally attends religious services, occasionally goes to restaurants, and she is able to drive for 15 to 30 minutes at a time. The ALJ found that plaintiff engages in a fairly normal range of daily activities, which are inconsistent with her allegation of disability. (Tr. 18). Significant daily activities may be inconsistent with claims of disabling pain. See Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001). As such, the ALJ properly determined that plaintiff's ability to engage in all of these activities on a regular basis appears inconsistent with the inability to work.

An administrative opinion must establish that the ALJ considered the appropriate factors. See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001). However, each and every Polaski factor need not be discussed in depth, so long as the ALJ points to the relevant factors and gives good reasons for discrediting a claimant's complaints. See Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001). In this case, the reasons given above by the ALJ for discrediting plaintiff's complaints of disabling pain are sufficient and his finding that plaintiff's complaints are not credible is supported by substantial evidence. Accordingly, the undersigned recommends that the decision of the Commissioner denying plaintiff's benefits be affirmed.

**RECOMMENDATION**

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner denying

plaintiff's applications for a Period of Disability and Disability Insurance Benefits, under Title II of the Social Security Act, be **affirmed**.

The parties are advised that they have eleven (11) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

Dated this   11th   day of August, 2005.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE